# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

JAMES ARTHUR KING, JR.,

   Plaintiff,

v.

CAPT. LONNIE DORN,
C. DONNER,
PHILLIP FASHOULA,

   Defendants.

Civil Action No.: ELH-17-3740

## MEMORANDUM OPINION

Plaintiff James Arthur King, Jr., who is self-represented, filed a civil rights complaint pursuant to 42 U.S.C. § 1983, alleging that correctional officers at Patuxent Institution used excessive force against him, causing a broken ankle. ECF 1. Defendants Captain Lonnie Dorn, Officer Cordell Donnor, and Officer Philip Fashola[1] filed a motion to dismiss or for summary judgment (ECF 15), supported by a memorandum (ECF 15-1) (collectively, the "Motion") and several exhibits. They assert that plaintiff's injury was due to his own actions and not that of the officers involved. Plaintiff opposes the motion, but does not include with his opposition a statement under oath. ECF 18. Plaintiff and defendants rely on video footage of the events giving rise to this lawsuit, which has been filed with the court (ECF 16),[2] along with a Declaration under

---

[1] The Clerk shall correct the docket to reflect the full and proper spelling of defendants' names. Fashola is no longer employed as a correctional officer with the Maryland Department of Public Safety and Correcitonal Services. ECF 15-4, ¶ 1.

[2] The Declaration accompanying the DVD exhibit (ECF 16) is improperly docketed as a "Supplement to Complaint," submitted by plaintiff. But, it appears to have been filed by the defense. The DVD itself is filed separately and is not available on the court's electronic docket. *See* ECF 16-1 (notice of separate filing). The Clerk will be directed to correct the docket entry.

oath stating that plaintiff viewed the video footage at Western Correctional Institution, where he is now incarcerated.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6 (D. Md. 2016). For the reasons stated below, defendants' Motion will be construed as one for summary judgment and shall be granted.

## I. Background[3]

As about 12:20 p.m. on November 18, 2017, while plaintiff was incarcerated at Patuxent Institution, he was asleep in his cell when Officer Phillip Fashola awakened him by yelling at other inmates about the television. ECF 1 at 5. Plaintiff claims he observed that Fashola "had grabbed some old man and put his arm around his back." *Id*. Plaintiff then heard another inmate criticize the manner in which Fashola was running the tier (B-Wing) and that he was "acting like a B." *Id*. Fashola allegedly responded that all of the inmates who were assigned to B-Wing were there because the "rest of the jail don't want to mess with [you]." *Id*.

King then spoke up and said, "Hay [sic], let me get your name, I'm gonna rite [sic] you up." *Id*. In response, Fashola replied, asking plaintiff for his identification and stating that he was going to put plaintiff on lock-up for threatening him. *Id*.

Plaintiff followed Fashola "outside to the bubble," told Fashola he did not want any "problem," and asked Fashola to return his identification. *Id*. Plaintiff claims that Fashola then threw up his hands and said he was not scared of plaintiff. King replied that he was not scared of Fashola, either. *Id*. Fashola then called for assistance. *Id*. Other correctional officers arrived, Fashola went into the "bubble" after the inmates in B-Wing were interviewed, and then the additional officers left. *Id*. Plaintiff does not indicate why other inmates were interviewed or the

---

[3] As discussed, *infra*, the facts are construed in the light most favorable to plaintiff.

topic of the interview. In any event, the video surveillance does not appear to depict officers interviewing other inmates in the dorm. *See* ECF 16 (video).

After one hour passed, plaintiff was called into the hallway by Officer C. Donnor. ECF 1 at 5. When plaintiff came to the hallway he saw approximately eight correctional officers lined up on the side of the hallway so he turned around to leave. *Id*. He states that Donnor tried to stop him from going back to B-Wing and, in so doing, slammed the door on King's ankle, breaking his ankle. *Id*. Plaintiff adds that the door was slammed so hard on King's ankle that a screw came out of the door and impaled the skin on plaintiff's ankle. *Id*. As a result, plaintiff states he walks with a cane now and claims he has been left in a cell without assistance for his broken ankle. *Id*.

Further, plaintiff states that Captain Lonnie Dorn contributed to his injury because he believed "Fashola's lies on the ticket" when Dorn was investigating Fashola's removal from his post.[4] Because Dorn believed what was written in the ticket, plaintiff reasons, the "squad came back and slam[med his] ankle in the steal door." *Id*. Plaintiff suggests that Dorn could have instead simply asked why the "squad" did not lock plaintiff up the first time they came to B-Wing, but instead Dorn ordered them to go back to B-Wing and move plaintiff to lock-up. *Id*.

As noted, defendants have submitted with their Motion a video recording of the incident. Unfortunately, it does not have sound. Defendants aver that the video contradicts plaintiff's assertion that his ankle was slammed in a steal door by Donnor. Rather, they assert that the video and/or exhibits establish the following relevant events, ECF 15-1 at 2-4:

1.      Plaintiff left the dorm area and walked around the day room for several minutes. ECF 16 at 13:51:17 through 13:53:22.

---

[4] In the record before me, there is no other indication that Fashola was "removed from his post."

2. Plaintiff returned to the dorm and laid on his bed until Fashola came to the dorm to conduct inmate count following "chow time." *Id.* at 13:53:22 through 13:56:22.

3. Plaintiff left his bed and "acting belligerently, confronted" Fashola; Fashola turned to leave the area. Plaintiff "demanded" Fashola's "name and information" so he could put it in an administrative remedy procedure ("ARP") complaint and followed Fashola out of the dorm, "continuing to argue" with Fashola. *Id.* at 13:55:27 through 13:55:33.

4. After Fashola turned off the television to conduct inmate count, plaintiff removed his shirt and "took a fighting stance while verbally threatening" Fashola. *Id.*; *see* ECF 15-4, ¶ 3.

5. Plaintiff continued to engage with Fashola "in an agitated and belligerent manner." ECF 16 at 13:58:00 through 13:58:22.

6. Fashola called for assistance on his radio. *Id.* at 13:58:54.

7. Additional correctional officers arrived to talk to plaintiff. *Id.* at 13:59:57.

8. After approximately ten minutes, the correctional officers left and plaintiff returned to his bunk. *Id.* 14:08:22 through 14:12.00.

9. At approximately 4:00 p.m. the same day, Donnor asked plaintiff to come to the control area ("Bubble"). ECF 15-5 (Donnor Decl., ¶¶ 3-4). Plaintiff approached the Bubble, saw other correctional officers, turned around, and ran back into the dorm. The officers pursued plaintiff into the dorm. ECF 16 at 16:35:00

10. Plaintiff attempted to close the door. ECF 15-5, ¶¶ 3-4. He is seen falling to the floor as he attempted to enter the dorm. Plaintiff got back up and ran into the dorm area. ECF 16 at 16:35:07.

11. Correctional officers followed him, cuffed him, bandaged his wound, and placed him in a chair. *Id.* 16:37:40 through 16:45:50.

As noted, there is no sound for the video. Thus, the video does not reflect threats or demands by plaintiff.

Moreover, there is no video footage that depicts how plaintiff's ankle was injured or who closed the door. Indeed, plaintiff is seen walking, without assistance. Verified medical records submitted by defendants indicate that plaintiff's ankle bones were not broken, but an x-ray revealed that there was a possible fracture of the hardware placed in his ankle in connection with the repair of a previous fracture. ECF 15-8 (medical records) at 8 (x-ray report). The wound to plaintiff's ankle, which was dressed and treated immediately after plaintiff fell, was caused by orthopedic hardware puncturing plaintiff's skin. *Id*. at 2 (initial treatment); 6 (indicating bleeding stopped quickly); 30 (orthopedic surgeon notes indicating round wound where screw came through skin is healed). The radiologist noted that the current x-ray imaging should be compared to prior images to confirm or rule-out that possibility. *Id*.

Plaintiff reported to Ava Joubert, M.D. that, during the incident that is the subject of this lawsuit, one of the orthopedic screws implanted in his ankle came out and he pushed it back in. *Id*. at 24, *see also id.* at 30. On February 22, 2018, surgery for removal of the hardware was recommended by an orthopedic surgeon. *Id*. at 30. The surgery was approved on June 9, 2018. However, the record does not reflect whether the surgery was performed. *Id*. at 32.

Officer Fashola prepared a Notice of Inmate Rule Violation written on November 18, 2017. ECF 15-3 at 3. It indicates that plaintiff was charged with violating rules 104 (use of intimidating, coercive, or threatening language) and 405 (demonstrating disrespect or use of vulgar language). The narrative on the notice states that Fashola was assigned to B-Wing at 12:50 p.m. that afternoon when the inmates were returning from "chow." *Id*. The television was on in the dayroom and Fashola turned it off so he could conduct an informal count of the inmates as they returned. *Id*.

5

This apparently angered plaintiff, who confronted Fashola and stated, "Why do you turn off the tv, I'll fuck you up because I'm not afraid of none of yall COs." *Id*. Fashola states that plaintiff's verbal confrontation was accompanied by his actions of removing his shirt and assuming a "fighting stance." *Id*. In response, Fashola "notified utility via radio." *Id*. Once the additional officers arrived, plaintiff continued to behave in a belligerent manner. *Id*. The account written by Fashola in the Notice of Rule Violation is confirmed in the video surveillance. ECF 16.

Plaintiff pleaded not guilty to the rule violations at his adjustment hearing and maintained that he simply asked why Fashola turned off the television and asked the officer for his name. ECF 15-3 at 8. The hearing officer found plaintiff guilty of both violations and noted that he found Fashola's report more credible than plaintiff's testimony because plaintiff "signed the Violation Notice by writing 'F--- you' instead of his name." *Id*.; *see also* ECF 15-3 at 4 (Notice signed on November 18, 2017, at 3:50 p.m., stating on Inmate Signature line: "FUCK YOU!").

Defendants have provided declarations under oath in support of their Motion. In Fashola's Declaration, he avers that plaintiff verbally threatened him after he (Fashola) turned off the television. ECF 15-4 at 1. He then made a request for plaintiff to provide his identification so a notice of infraction could be written for King's behavior. *Id*. When plaintiff continued with his threatening behavior, Fashola called for assistance via the radio and he was advised to remain in the control area by Captain Dorn because of plaintiff's threats. *Id*. at 1-2. Fashola denies ever making contact with plaintiff or closing a door on his ankle. *Id*. at 2.

In his Declaration, Donnor reports that "the sergeant requested that I call Mr. King to the bubble to be cuffed for escort to the segregation tier." ECF 15-5 at 1. Donnor states that plaintiff approached the bubble, stopped, turned around, and ran back towards the dorm area. *Id*. Donnor, along with the other officers present, pursued plaintiff. *Id*. As plaintiff approached the threshold

6

of the door, Donnor states that plaintiff tried to close the door behind himself in an effort to deter the officers from pursuing him. *Id*. at 1-2. When he did so, plaintiff tripped over the threshold and fell to the floor, but quickly regained his footing and continued to flee the officers. *Id*. at 2. After reaching the dorm area, plaintiff sat on the edge of a bunk and he was cuffed by one of the officers. *Id*. The sergeant bandaged King's ankle wound and plaintiff was taken to the medical area via wheelchair.[5] *Id*. Once at the medical unit, Donnor states that plaintiff refused treatment and walked back to the unit, without assistance. *Id*.

Captain Lonnie Dorn states under oath that he did not learn of plaintiff's ankle injury until after it happened, as he was not personally involved when plaintiff ran from the officers. ECF 15-6 at 1. Dorn denies ever physically contacting plaintiff or denying him medical attention. *Id*. at 2. Dorn's sole involvement in the events of November 18, 2017, was to request that Fashola remain in the control center after learning that plaintiff had threatened Fashola. *Id*. at 1.

In his opposition, plaintiff focuses on the severity of his injury and claims that the officers involved tried to cover-up what occurred. He does not provide a statement under oath, but claims that there are witnesses who will support his claims. ECF 18. Plaintiff does not explain how the witnesses listed were involved, what they observed, or the facts they may provide in support of his claims. Plaintiff also lists as a witness the video surveillance footage provided to the court by defendants. *Id*. at 2.

## II.     Standard of Review

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See*

---

[5] The first aid rendered to plaintiff can be observed in the video. ECF 16.

*Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 F. App'x 220, 222 (4th Cir. 2016) (per curiam). However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[6]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C

---

[6] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams*, 672 F. App'x at 622 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).

WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). However, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167.

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)); *see also Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 F. App'x 552, 561 (4th Cir. 2015).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). But, a nonmoving party's Rule 56(d) request for

9

additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, ___ F.3d ___, 2019 WL 350375, at *6 (4th Cir. Jan. 29. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id*. (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Plaintiff has not filed an affidavit under Rule 56(d). Moreover, I am satisfied that it is appropriate to address the defendants' Motion as one for summary judgment, because it will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law.").

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing

the witness credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). Conversely, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'"

*Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp.*, 477 U.S. at 323–24).

### III. Discussion

#### A.

Section 1983 of 42 U.S.C. provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 135 S. Ct. 1983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997). Thus, "analysis of an excessive force claim brought under § 1983 begins with 'identifying the specific constitutional right allegedly infringed by the challenged application of force.'" *Orem v. Rephann*, 523 F.3d 442, 445 (4th Cir. 2008)

13

(quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

**B.**

The Eighth Amendment to the Constitution is at issue here. It prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). This prohibition "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).

The Fourth Circuit has observed that "not all Eighth Amendment violations are the same: some constitute 'deliberate indifference,' while others constitute 'excessive force.'" *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986)). In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, and failure to render medical assistance. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Thompson*, 878 F.3d at 97.

In *Graham v. Connor*, 490 U.S. 386 (1989), the touchstone case with respect to excessive force claims under § 1983, the Supreme Court rejected the notion "that all excessive force claims brought under § 1983 are governed by a single generic standard." *Id.* at 393. The Court held that claims for the use of excessive force in effectuating an arrest or other seizure are governed by the Fourth Amendment's prohibition against "unreasonable" seizures; claims of excessive force against a convicted prisoner are governed by the Eight Amendment's prohibition of "cruel and unusual punishment"; and claims of post-arrest excessive force against an arrestee or pre-trial detainee are governed by the Due Process Clause of the Fourteenth Amendment, which prohibits

before conviction "the use of excessive force that amounts to punishment." *Id.* at 394 & n.10. *Accord Orem*, 523 F.3d at 446; *Taylor v. McDuffie*, 155 F.3d 479, 483 (4th Cir. 1998).

The contours of a prisoner's constitutional right under the Eighth Amendment to be free from excessive force at the hands of corrections staff has long been established. Whether force used by prison officials was excessive is determined by inquiring if "'force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm.'" *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). The court must consider the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley*, 475 U.S. at 321; *see Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008).

Notably, the absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34 (2010). The extent of injury incurred is one factor indicative of whether the force used was necessary in a particular situation, but if force is applied maliciously and sadistically, liability is not avoided simply because the prisoner had "the good fortune" to escape serious harm. *Id*. at 38 ("[A]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.")

If "prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9. To the extent injuries are modest, this would be reflected in the award of damages. *See Wilkins*, 559 U.S. at 40. But, "no

16

particular extent of physical injury is required to establish an excessive force claim under the Eighth Amendment." *Sawyer v. Asbury*, 537 Fed. App'x 283, 290 (4th Cir. 2013).

Nevertheless, "'not every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 9).

In this case, there is a video recording. In *Scott v. Harris*, 550 U.S. 372 (2007), the Supreme Court determined that, when "opposing parties tell two different stories, one of which is blatantly contradicted" by video evidence contained in the record, "so that no reasonable jury could believe it, a court should not adopt that version of the facts. . . ." *Id.* at 380. Rather than relying on "visible fiction" propounded by the party whose account is contradicted by the video evidence, a court should "view[] the facts in the light depicted by the videotape." *Id.* at 381.

But, in *Witt v. West Virginia State Police, Troop 2*, 633 F.3d 272 (4th Cir. 2011), the Fourth Circuit said that the principle articulated in *Scott* does not license a court to reject one side's account as a matter of law if the "documentary evidence, such as a video," merely "offers *some* support for [the other side's] version of events." *Id.* at 276 (emphasis in original). Nevertheless, "[i]ncontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court" when resolving a motion as a matter of law, "if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d. Cir. 2007) (applying *Scott* in context of motion for judgment as a matter of law).; *see also Sawyer*, 537 Fed. App'x at 291.

In this case, the video is not dispositive, although it tends to support the defense. But when, as here, a motion for summary judgment is supported by verified business records and declarations

17

under oath that disprove the claim asserted in the Complaint, there is no genuine dispute of material fact such that a reasonable jury could return a verdict in favor of plaintiff.

The only viable evidence before me indicates that plaintiff's injury was caused by his own actions when he attempted to run from correctional officers who apparently wanted to serve him with a notice of infraction. To the extent that plaintiff asserts that there was an undue delay in locking him up and that it should have occurred when officers first came to the dorm to talk to him, his assertion, even if true, does not transform the events that took place into a constitutional claim.

Whether plaintiff pulled the door closed or one of the officers closed the door to thwart plaintiff's escape is immaterial, as the alleged "force" used was not inflicted for the very purpose of causing plaintiff harm. Rather, the officers were confronted with an inmate bent on causing a disturbance and performed their job of intervening to keep everyone safe, without the use of any unnecessary force.

Moreover, any suggestion that the correctional officers did not render any aid to plaintiff following his injury is clearly refuted by the video surveillance depicts officers bandaging his ankle and helping him into a wheelchair.

The defendants are entitled to summary judgment. A separate Order follows.


February 8, 2019                                                  /s/
Date                                                               Ellen L. Hollander
                                                                     United States District Judge